```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2                       TOPEKA, KANSAS

 3   MARTIN J. WALSH,                    )
     SECRETARY OF LABOR,                 )
 4   U.S. DEPARTMENT OF LABOR,           )
     -------------------------- Plaintiff,)  Case No.
 5                                       )  20-2624-TC
        vs.                              )
 6                                       )
     DANIEL L. WHITNEY;                  )
 7   MICHELLE WILLSON;                   )
     MEDOVA HEALTHCARE FINANCIAL         )
 8   GROUP, LLC; MIDLANDS CASUALTY       )
     INSURANCE COMPANY, INC.;            )
 9   JUST DIABETIC SUPPLIES, LLC;        )
     ADVENT HEALTH SERVICES, LLC         )
10   d/b/a DIRECTHEALTH; BENISON         )
     CAPITAL ADVISORS, INC.; PATRICK     )
11   ENTERPRISES, INC.; LIFESTYLE HEALTH )
     PLANS GROUP BENEFIT PROGRAM;        )
12   LIFESTYLE HEALTH PLANS - LEVEL      )
     FUNDED GROUP BENEFITS; LEVEL        )
13   FUNDED LIFESTYLE SELF-INSURED       )
     HEALTH PLAN; and LIFESTYLE HEALTH   )
14   PLANS,                              )
     -------------------------- Defendants.)
15

16              TRANSCRIPT OF MOTION HEARING
          (MOTION FOR ORDER UNDER THE ALL WRITS ACT)
17
        PROCEEDINGS had before the Honorable Toby Crouse, United
18   States District Court Judge, for the District of Kansas,
     Topeka, Kansas, on the 27th day of May, 2021.
19
     APPEARANCES:
20
     For the Plaintiff:       Traci Martin
21                            Usha Rengachary
                              2300 Main Street, Suite 1020
22                            Kansas City, MO   64108

23   For the Defendant:       Lauren E. Tucker McCubbin
                              900 W. 48th Place, Suite 900
24                            Kansas City, MO   64112-1895

25   Court Reporter:          Sherry A. Harris, C.S.R.
```

```
 1                         PROCEEDINGS
 2             THE COURT:  All right.  Good morning, everybody.  We
 3   are here in case number 20-2624.  Sorry for the delay.  I had
 4   to pull up my docket sheet here.  Counsel, please state your
 5   appearances.  Before you do so, 20-2624, United States
 6   Department of Labor versus Daniel Whitney, et al.  Counsel, now
 7   please state your appearances for the record.
 8             MS. MARTIN:  Good morning, Your Honor.  Traci Martin
 9   for the U.S. Department of Labor.
10             THE COURT:  Good morning, Ms. Martin.  Will you
11   primarily be speaking today?
12             MS. MARTIN:  I will, Your Honor.
13             THE COURT:  Awesome.  Good to see you again.
14             MS. RENGACHARY:  Good morning, Your Honor.  Usha
15   Rengachary for the Department of Labor.
16             THE COURT:  Good morning.  Good to see you too.
17             MS. TUCKER MCCUBBIN:  Good morning, Your Honor.
18   Lauren Tucker McCubbin on behalf of all defendants.
19             THE COURT:  Good morning, Ms. Tucker McCubbin.
20             All right.  So we are here today on--
21             MS. TIBBETS:  Your Honor, hi.  Gaye Tibbets here for
22   the independent fiduciary.  I'm joined by Alan Curley and by
23   Rob Moore, who is the representative for the independent
24   fiduciary.
25             THE COURT:  Good morning, Ms. Tibbets.
```

1       All right.  So we are here today to address the
2  Secretary's motion under the All Writs Act invoking the
3  Anti-Injunction Act, and I feel like this is a little bit of
4  fed courts 101 here, so this is-- thank you for coming to the
5  hearing today.  I've just got random questions as to how it is
6  go.  And I have read the parties' briefs.  I was hoping I would
7  have a little more adversity between the parties, but it seems
8  like you all are in agreement that this is the way it should
9  go.  And the reason I guess that I wanted to talk to you was
10 kind of set out in the order.  While I don't dispute the power
11 that I have, I think the prudential concerns for exercising
12 that power is something that does bother me and so I want to
13 do, maybe to borrow a phrase from the medical community, as
14 least harm as possible to the other people that are out there.
15      So I have a series of questions for you.  I have
16 reviewed your briefs, the authorities cited therein, and just
17 have general questions that may betray a little bit of
18 ignorance of how these ERISA plans work and how it affects, for
19 lack of a better word, people on the street.  So I guess
20 instead of asking you all to do kind of a formal presentation
21 I'll probably just ask questions.  And my train of thought
22 sometimes tends to get too single-minded focussed and so if I'm
23 looking at this side of the room and you have something to say,
24 don't hesitate to speak up because you may be able to
25 shortchange that.  So don't hesitate to do that.

1    And I guess before we go into that, do you all have
2 anything for me that you want to say in advance, or can we just
3 jump into the questions?
4    MS. MARTIN:  The Secretary does not have any
5 preliminary matters.
6    MS. TUCKER MCCUBBIN:  The same, Your Honor, for the
7 defendants.
8    THE COURT:  All right.  Thank you.  All right.  So the
9 first question I have is:  How does this work relative to the
10 plan beneficiaries?  My understanding is you all have taken
11 over a bunch of different plans and employees will make claims
12 against their plans.  Will you suspend payments for the claims
13 relative to the plan or is your concern only limited to those
14 who might sue the plan?  So in other words, employers suing the
15 plan?  If that makes sense.  And I'm probably not using the
16 right terminology so--
17    MS. MARTIN:  I understand Your Honor's question.  The
18 Secretary's concern at this point, and I believe all parties,
19 want to preserve plan assets to the extent possible.  And in
20 entering into this order we believe that that would be the best
21 way to preserve plan assets.  It would not preclude an
22 individual beneficiary from making claims just as he or she
23 always would, and those would be processed by Medova with the
24 independent fiduciary's oversight just as it would regularly.
25 This specifically would concern not only individual claimants

1  but also third parties, such as brokers or medical providers,
2  from making lawsuits-- from filing lawsuits against any of
3  these entities.  You know, specifically we don't want anybody
4  to cut in line just because, like as a medical provider, they
5  might have access to better legal representation that would
6  allow them to file a lawsuit.  We want, to the extent possible,
7  all claims to be processed in the normal order that they would.
8           THE COURT:  Okay.  So I guess just hypothetically--
9  and thank you for standing up.  You don't have to.  Again, if
10 you were to tell me that seven months ago I would have stood up
11 anyway, so I'm with you.  So do whatever you feel comfortable
12 with.  So let's assume, to play that out, Joe Smith submits a
13 claim to the Acme plan for a prescription.  Joe Smith continues
14 to get his claim paid.  But if the Acme plan goes bankrupt, the
15 hospital can't sue the Acme plan?  Is that fair?
16          MS. MARTIN:  Yes, that is correct.
17          THE COURT:  Okay.  And when you say preserve assets,
18 you may negotiate a rate vis-a-vis the plan and Medova?  In
19 other words, if a plan is entitled to 100 percent
20 reimbursement, you're hoping to structure something across the
21 board with all plans that would be an 86 percent or, I don't
22 know what--
23          MS. MARTIN:  Yeah.  Your Honor, if possible, I think
24 maybe the IF would be able to speak on the exact claim.  At
25 this point--

1  THE COURT: I'm just wondering how it works. I mean
2  when I now hear preserve assets I hear somebody's taking a
3  haircut and you're just trying to, for lack of a better word,
4  give some order to that process of administering those
5  haircuts.
6  MS. MARTIN: We want the claims processed to operate
7  as normally as possible. So we don't-- as I said, we don't
8  necessarily want a single claimant, a medical provider or a
9  broker or some other party, coming in and, you know, getting a
10  larger piece of the asset that they might in the normal process
11  of how claims are normally processed. So, you know, that's our
12  concern. And, you know, we would rather save any sort of, you
13  know, legal fees and various courts' time by settling those
14  claims outside of the litigation.
15  THE COURT: Okay.
16  MS. TUCKER MCCUBBIN: Your Honor, if I may just--
17  THE COURT: Sure.
18  MS. TUCKER MCCUBBIN: --interject for a moment. And
19  I'll, obviously, defer to the independent fiduciary, but at
20  this juncture we're not aware of the necessity for anyone to
21  take a haircut, for better or for worse. The necessity for
22  this motion, as I understand it and as defendants understand
23  it, is that in order to allow the independent fiduciary to
24  continue to pay benefits and to administer the plans in
25  Medova's stead, or along with Medova, it would be not only a

1  distraction but a potential use of Medova's own resources as
2  well as the resources of the other entities and individuals
3  who've been named as defendants in the litigation that could
4  otherwise be available to the extent that there is a necessity
5  to provide additional funding or address other issues in
6  conjunction with that claims process.  So it's not that
7  presently we are concerned, or at least from the defendant's
8  perspective, that there is some insufficient funding or
9  inability to pay claims; it's that we're trying to avoid that
10 probability in the event that there was a massive influx of
11 litigation by virtue of the circumstances of this dispute.
12         THE COURT:  Okay.  That's helpful.  Thank you.
13         So that jumps in, and I guess a question to both of
14 you, I noticed in your brief that there were three lawsuits
15 filed, looks like footnote 3 on page 6 of the government's
16 brief, document 46, and if I read Medova's position, two of
17 those have been resolved and so there remains one matter out of
18 St. Louis City or County or something like that.  Is that what
19 we're looking at?
20         MS. TUCKER MCCUBBIN:  Your Honor, I'm aware of an
21 additional lawsuit that was filed against Medova I believe in
22 Georgia or Alabama -- I think it's in Georgia -- that was filed
23 since the briefing was completed in this dispute, and I
24 couldn't even give you a sense of the nature of the claims, but
25 I know an additional suit has been filed.

1       THE COURT:  Okay.  And those are the extent of what we
2  know?
3       MS. TUCKER MCCUBBIN:  Yes, Your Honor.
4       THE COURT:  Help me understand a little bit, and this
5  probably goes beyond what is going on, but let's assume that
6  I'm a claimant in the, we'll pick Georgia.  How would I, as the
7  claimant, learn of this injunction that you all want me to
8  enter?  Or the-- I assume we'll refer to it as an injunction.
9  How would this relief be communicated to a claimant in Georgia
10 state court?
11      MS. MARTIN:  Specifically, the order has provisions
12 for notice that the independent fiduciary would provide notice
13 to all employers that have Lifestyle health plans and that then
14 it would be incumbent on the employers to notify the
15 beneficiaries of their individual plans.
16      THE COURT:  So two questions. One is order.  Did you
17 submit a draft order that I don't-- I just didn't see it on the
18 docket sheet.
19      MS. MARTIN:  Yes, Your Honor.  And I believe the
20 confusion may have been because it's-- the ECF filing said that
21 it should be submitted to the magistrate because it was a
22 nondispositive motion.  And so we e-mailed it to Judge--
23      THE COURT:  Mitchell.
24      MS. MARTIN:  --Mitchell's chambers.  So I have a copy,
25 a hard copy, if you would like to see it, but I believe that is

1  where the confusion lies.
2          THE COURT:  Okay.  Do you have an extra hard copy?  I
3  don't want to take your copy.
4          MS. MARTIN:  Yeah.  You can have this.  May I
5  approach?
6          THE COURT:  Yeah, please.  Thank you.
7          MS. MARTIN:  And also, Your Honor, I'll direct you to
8  paragraph 6.  And specifically the independent fiduciary will
9  serve on any present litigants.  And so as for the St. Louis
10 County and Georgia litigation, they would receive direct notice
11 of the order should be entered.
12         THE COURT:  Okay.  So then do you -- and, again, I
13 apologize for the fed court type of question here -- do you
14 then file something in the St. Louis County court so that the
15 state court knows don't proceed any further?  You know, like,
16 so in a notice of removal I would tell the court of whatever
17 county, don't proceed any further; I've removed it to federal
18 court.  Do you do something like that or-- I'm just curious.
19         MS. MARTIN:  Yeah, I'm not sure specifically of the
20 logistics for-- you know, under Missouri civil procedure and
21 state court action, how that would work.  But it would be our
22 understanding that it would be filed with the court to provide
23 them notice of this injunction.
24         THE COURT:  Okay.  Give me just a second.  I'm sorry.
25 Take a moment to review this.  Okay.  So another random

1  question is how, if I am the claimant in St. Louis County, do I
2  challenge this if I think, for example, the court in Kansas
3  doesn't have the authority to enjoin this?  Is there a
4  provision that they could file something as an intervenor
5  perhaps in this court to attack that?  Or do you know?
6          MS. MARTIN:  It's our understanding, when all writs
7  have been entered in other cases, that they have the ability,
8  the claimant would have the ability, to intervene by filing
9  something with this court.
10         THE COURT:  So the St. Louis County claimant would be
11 able to come to the Kansas Federal Court and challenge the
12 breadth or the propriety of such an order?
13         MS. MARTIN:  Yes, Your Honor.
14         THE COURT:  Okay.  So somewhat related, somewhat
15 related, the Connecticut case that you cited in your brief, I
16 was curious as to what relief, because I didn't have a copy of
17 this draft proposed order, what you are wanting me to do.  Is
18 this similar to what the Connecticut case did?  Because I
19 reviewed that case and it looked like they issued, for lack of
20 a better word, a normal memorandum and order.  And so I mean
21 I'm just-- kind of the-- where did this come from?  Where does
22 this proposed order come from?  Is this kind of what courts do?
23 Help me understand that, if you know.
24         MS. MARTIN:  This order is similar to what has been
25 entered into in other cases.  If you could direct me to the

1  name of the Connecticut case.
2          THE COURT: Yeah. I've got it here somewhere.
3  <u>Stewart v. Bridgeport</u>. I think you cited it on page-- you cite
4  it on page 7 through 8 of your brief, of document 46.
5          MS. MARTIN: And while the Connecticut case I believe
6  was a memorandum and order, it was a recent decision, in other
7  cases that were cited where it was, I guess nondisputed, the
8  judge just entered an order similar to the one that we
9  provided.
10         THE COURT: Okay. So that was actually part of my
11 curiosity is I didn't know, getting ready for this, what your
12 proposed relief would look like. Would you prefer this
13 proposed order, a memorandum and order, or both? Or does it
14 matter?
15         MS. MARTIN: It doesn't matter to us. I mean our
16 preference would be an order similar to the one provided to
17 you. We believe that, you know, simplicity might be the best
18 for providing it to all the entities that would need to receive
19 notice.
20         THE COURT: So on the proposed order if there were a
21 paragraph in there discussing the All Writs Act as well as the
22 Anti-Injunction Act and the exceptions thereto, I assume that
23 you wouldn't-- in other words, incorporating somewhat by
24 reference those concerns, that wouldn't bother you?
25         MS. MARTIN: No, Your Honor.

1    THE COURT: Okay. Somewhat related to that
2 Connecticut issue, you went through a series of cases like the
3 <u>Scalia v. Advance Benefit Management</u> case and then there was
4 also <u>Acosta v. Riverstone</u> case and <u>Chao v. Sai Medical</u>.
5    And I apologize, Ms. Harris. I'll give you the
6 spellings of those.
7    Are those all the same types of cases like this one or
8 are they distinguishable -- not distinguishable -- are they
9 just different species of the same All Writs Act request? If
10 that makes sense. I'm just wondering, like, what's the best--
11 what, in your view, or the Secretary's view, is the best model
12 for me to go for?
13    MS. MARTIN: The cases cited that were district court
14 cases in which the Secretary asked for all writs relief are
15 very similar to the case at bar. There may be differences in
16 degree of the participation of the defendants. So, you know,
17 in some cases the defendants weren't active in assisting with
18 the administration of the plan like they are in our case, but
19 they all were very similar in that there was a plan in which
20 the Secretary had an independent fiduciary that was overseeing
21 the management of the plan and they were looking to preserve
22 assets for the administration.
23    MS. TUCKER MCCUBBIN: Your Honor , in candor, the
24 primary distinction between the cases the Secretary cited and
25 this dispute is that in those cases it's my understanding that

1  there had already been some sort of either adjudication or
2  agreement that there was some insolvency or some other
3  limitation on funds.  We have not conceded that is the case
4  here.  We do not concede that is the case here.  But we do
5  still think the relief is appropriate because of the potential
6  that the influx of litigation by virtue of the nature of this
7  dispute if, frankly, the number of plans involved and
8  potentially affected parties and providers could create the
9  problem that we're trying to avoid if the relief is not
10 provided.
11            THE COURT:  Okay.  And you would agree that the model
12 set forth in the Connecticut case is an appropriate one or some
13 semblance of the proposed-- or I assume you had a part in
14 drafting or are not objecting to that.
15            MS. TUCKER MCCUBBIN:  Not objecting would be a more
16 accurate description, Your Honor.  And from a pragmatic
17 standpoint, I would envision that if the court were to enter an
18 order that wherever a suit may be filed that the defendants
19 would file that order with the court as a basis to stay those
20 proceedings, not unlike what happens in a bankruptcy proceeding
21 when the court issues a stay, and that would advise the
22 claimant of their right to contest or seek relief from this All
23 Writs Act order in this jurisdiction.  That's how I believe
24 that would happen.
25            THE COURT:  In other words, you're suggesting to add

1  something else that would direct the defendant to file this and
2  then notify the claimant of the ability obligation to challenge
3  in this court?
4          MS. TUCKER MCCUBBIN:  You certainly could direct the
5  defendant to file this.  But I see it as a defense.  Frankly, I
6  mean it's an injunction, for lack of a better term, against
7  proceedings.  It's something that would be a defense to the
8  continued proceedings or any of the new ones that are filed.
9  So I think it would be incumbent upon the defendant to file it
10 if they are named in other litigation.  But the court can use
11 its discretion as to how it would like to describe that within
12 the order.
13         THE COURT:  Yeah.  And part of the problem is I just
14 don't have a sense as to what the best method is.  So somewhat
15 of an odd question that probably has a simple answer I'm not
16 seeing, what happens to the statute of limitations while a
17 claimant is enjoined from pursuing claims against Medova?  Is
18 that tolled like an American Pipe tolling something or other
19 or--
20         MS. MARTIN:  I mean it would be our understanding that
21 it would be tolled.  Because if the claim had already been
22 filed in court, then the statute of limitations would have
23 stopped running.
24         THE COURT:  Yeah.  So, I mean, let's assume that I
25 issue this order on May 27th, today, and Acme Brick Company was

1 going to file a claim against you all on May 28th but now
2 they're enjoined from doing so because they read about this
3 wonderful proposed order in The New York Times.  They're just
4 out?  I mean so-- I mean part of my concerns is maybe their
5 statute of limitations is on May 29th.  What do they do?  I
6 mean is that-- is there a tolling mechanism?  Or would putting
7 something like that-- and I haven't done American Pipe tolling
8 for a long time.  I don't know what the right answer is.  But
9 it strikes me that that would harm some claimants.
10          MS. MARTIN:  And we haven't researched this exact
11 point, Your Honor, but we do believe that there would be a
12 tolling with this order going into place.  And if Your Honor
13 would like to add some language to that affect, we have not
14 researched this point, Your Honor.  We apologize.
15          THE COURT:  No.  And--
16          MS. MARTIN:  As it relates to state law specifically.
17          THE COURT:  Yeah.  And whether or not a federal-- I
18 mean my recollection is there were some cases in the last four
19 or five terms about tolling, and something makes me think that
20 there may be a question as to whether federal courts have the
21 power to toll state court statutes of limitation as well.  I
22 just don't know.  The reason I raised it is because I didn't
23 know and I was hoping you all did.
24          Ms. Tucker McCubbin, any thoughts on that?
25          MS. TUCKER MCCUBBIN:  Certainly something that the

1  parties can provide additional briefing on if the court would
2  like it.  I would suggest that I understand the concept to be
3  not that there is a bar on any interested party's ability to
4  obtain relief, but that the appropriate forum and procedure for
5  that relief is through the independent fiduciary and the
6  process the independent fiduciary establishes for providing
7  that relief.  So it's not a question of can any provider or any
8  other individual who is making a claim obtain any payment or
9  satisfaction; but, instead, that that process be dictated by
10 the independent fiduciary as opposed to multiple pieces of
11 litigation and lots of jurisdictions.  At least that's
12 conceptually what I understand.  I'll defer to the Department
13 if they disagree.
14            MS. MARTIN:  Very well stated.
15            THE COURT:  So, yes, I get the concept.  What I'm
16 concerned with is all collection activities against Medova,
17 dot, dot, dot, are hereby enjoined pending final disposition of
18 this action.  If I'm advising my client, Acme Brick Company,
19 whether or not they can file a claim on May 28th, so to speak,
20 and then you get into the things, well, I e-mailed the
21 independent fiduciary but I misspelled the e-mail address, I
22 mean, again, these are all law school hypotheticals I get, but
23 all right.  So that's the end of, I guess, my sticky note
24 questions.
25            Now I guess the thing is what to do.  I'm okay with

1   your concept of doing this.  I just don't know the best way to
2   do it.  If you guys wanted to take a look at that tolling
3   issue, and I don't know that American Pipe-- that's the only
4   tolling document I can think of right now so that's why I'm
5   using it.  If you guys want to take a look at that and submit
6   your thoughts, how time sensitive is your request for this
7   order and how do you want to go about looking for the answers
8   to this concern, if it is a concern, and then getting a
9   proposed order out?  I mean I can put together a paragraph kind
10  of incorporating by reference the power issues relative to the
11  All Writs Act and the exceptions to the Anti-Injunction Act
12  relatively quickly.  And so I could do that if I had the
13  tolling question kind of answered.  And maybe it's all tied up
14  into they're enjoined from pursuing litigation but not from
15  filing it, and that would save their tolling.  I just haven't
16  thought through the mechanics of it of how that would work.
17           MS. TUCKER MCCUBBIN:  Your Honor, I think there are
18  some tweaks that could be made to the proposed order that might
19  address your concerns and also specifically answer some of
20  those questions for other claimants.  I don't know that it is
21  necessary to enjoin the filing of suit.  I think it's necessary
22  to stay or to enjoin the continued process.  From a timing
23  standpoint, from defendants' perspective, I'm not aware of any
24  pending judgment that is capable of execution that this order
25  would need to apply to.  I do think there is a potential, given

1  some of the developments that were noted in the independent
2  fiduciary's most recent report, that when plans and
3  participants are notified of changes that we could see some
4  influx of activity in the coming weeks.  So our suggestion,
5  defendants, would be that the Department and defendants work
6  together to provide an amended proposed order and some
7  additional briefing on the tolling issue to the court.  And
8  we'd endeavor to do so fairly quickly.  We can discuss how
9  quickly that can happen.
10             THE COURT:  Yeah.  And I'm not looking for work over
11  the holiday weekend or additional briefing that you all want a
12  ruling.  I mean if you guys can figure out the answer to this
13  question and propose some language that you all are comfortable
14  with that would kind of address those concerns, I'm okay-- you
15  know, take as much time as you need or as little time as you
16  need.  I don't care one way or another.  But I do think that
17  that's a concern that if I were advising Acme Brick Company I
18  would be concerned with.
19             So, okay.  So we will-- I will just take this under
20  advisement, and then you can just e-mail the chambers-- the
21  draft order to chambers, and I'll get that taken care of as
22  quickly as possible.
23             MS. TUCKER MCCUBBIN:  This chambers, Your Honor?
24             THE COURT:  Yes, that would be fine.
25             MS. TUCKER MCCUBBIN:  Thank you.

```
1              MS. MARTIN:  Thank you, Your Honor.
2              THE COURT:  Okay.  Anything else?
3              MS. TUCKER MCCUBBIN:  No, Your Honor.
4              MS. MARTIN:  No, Your Honor.
5              THE COURT:  Okay.  With that, this hearing will be
6    concluded, and I'll look forward to a resubmitted proposed
7    order.  And if you can kind of, when you're doing so,
8    incorporate kind of the All Writs Act and the exception to the
9    Anti-Injunction Act from the Connecticut case language in
10   there, that would save me work.  But I can do that as well.
11             So, all right.  Thank you all.  Have a great weekend.
12             MS. TUCKER MCCUBBIN:  Thank you, Your Honor.
13             (THEREUPON, the hearing concluded).
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1  UNITED STATES OF AMERICA    )
                                )   ss:
 2  DISTRICT OF KANSAS          )

 3

 4                     C E R T I F I C A T E

 5

 6      I, Sherry A. Harris, Certified Shorthand Reporter in and

 7  for the State of Kansas, do hereby certify that I was present

 8  at and reported in machine shorthand the proceedings had the

 9  27th day of May, 2021, in the above-mentioned court; that the

10  foregoing transcript is a true, correct, and complete

11  transcript of the requested proceedings.

12      I further certify that I am not attorney for, nor employed

13  by, nor related to any of the parties or attorneys in this

14  action, nor financially interested in the action.

15      IN WITNESS WHEREOF, I have hereunto set my hand and

16  official seal at Topeka, Kansas, this 2nd day of June, 2021.

17

18                              /s/ Sherry A. Harris
                                Certified Shorthand Reporter
19

20

21

22

23

24

25
```